Gillette Company v. Dollar Shave Club Good morning, may I please report, William Adams for Appellant's Dollar Shave Club, Dorco and Pace Shave. I'd like to reserve three minutes for rebuttal, please. Done. In settling a patent dispute in 2008, Dorco, Pace and Gillette recognized that additional disputes may arise between them as new razor blade products were developed. And so they bargained for a comprehensive and efficient ADR procedure that would avoid federal court litigation and get disputes resolved efficiently. Yeah, we're familiar with the background, so let's get right into it. Sure. Your colleagues on the other side of the courtroom are making and pressing very strongly the 2014 agreement. If it means anything, it means that the ADR stuff was off the table because they specifically negotiated about it and it doesn't show up in that agreement the way it showed up in the 2008 agreement. So the sophisticated parties negotiated, they knew what they were doing. Why are they wrong? Well, that's an issue with arbitrage, Your Honor, and that's at step one of the analysis. The first step is who decides arbitrability, and the parties clearly and unmistakably decided arbitration in 2008. That's for the arbitrator. That's the very thing they're saying is not so. That's what I'm trying to get you to meet. I'm trying to get you to meet head-on their assertion that, no, there is no arbitration agreement anymore. 2014 kicked it. So it doesn't help you to say, well, that's an issue for the arbitrators, because that's just or not constitute a complete override of the 2008 ADR provision. Respectfully, Your Honor, we need to start at the 2008 agreement and see what it does to then understand the effect of the 2014 agreement and whether that in any way can abrogate the arbitration rights that are created in the 2008 agreement. Why is that so? Why isn't the question the interpretation and the effect of the 2014 agreement? That agreement does not on its face reference anything about arbitration. In interpreting that agreement and its effect, why isn't that something that the federal court addresses in the first instance? Because in the 2008 agreement, the parties committed to the arbitrators the issues of the existence, the scope, and the validity of the arbitration agreement. And the 2014 agreement presents exactly that issue. Is the 2008 agreement still valid, still effective, still enforced, notwithstanding the 2014 agreement? In 2008, they don't have an arbitration issue. Well, their argument is that you're in effect saying you can never get out of an arbitration agreement. Their position is, if we take your line of reasoning, no one ever gets out of an arbitration agreement, because no matter how clearly they speak, somebody will always stand up and say, well, that really goes to whether or not this replaces the earlier agreement, and that's for the arbitrator. And we agree with that. No matter what they said, no matter what they said in 2014, you would be able, if they said, you know, all ten of us who ever heard of this thing are going to come in, slit our fingers, put blood on the paper, and have a sea of clergy from every religion stand around us and say, and hear us swear, we reject the 2008 agreement. It does no longer exist. We don't want to be bound by it. It's this brand new agreement, and there's no arbitration, that no matter what they said, your position would be, well, wait a second, in 2008, we said arbitration, so whether or not that really replaces 2008 is something that has to go to the arbitrator. Yes, you're right. That's a remarkable position. It's an issue for the arbitrators, and it may be an easy issue for the arbitrators, but the FAA directs this to the arbitrator. How can that logically be so? How can that be consistent with the FAA, which says you respect people's contractual rights? That's why the FAA exists, is to respect contractual rights. So you're saying we always respect contractual rights, but only in one direction. No matter how clearly somebody speaks in the other direction, ignore it, because once upon a time they said something different. Do you have any case law at all to support the assertion that you can never get out of an arbitration agreement? It's not that you can never get out of the arbitration agreement, Your Honor. It's that the issue is for the arbitrator to determine in the first instance. That is saying that you have to go to arbitration. When you say it's not that you can't get out, it's that you have to go to arbitration, you are talking in a circle. The FAA, and in the Supreme Court and the Register of Case, recognizes that an agreement to arbitrate the issue of arbitrability is antecedent. Separate arbitration agreement from the agreement to arbitrate. But it's an agreement that Judge Jordan has hypothetically drafted here. That is, we reject any prior comment, suggestion to arbitrate in our new agreement. You're saying that the enforceability of that agreement has to go to an arbitrator, even though on its clear-on case it says there is no longer arbitration as an ADR mechanism. If a party were to assert that the prior agreement, the antecedent, the initial agreement, the arbitration clause is still valid and enforceable, and the dispute at issue is within that agreement, then an arbitrator needs to decide whether that first agreement is still valid and enforceable. Go ahead. That appears to be a departure from your own briefing. I thought you accepted what is clear, I think, from federal case law as well as New York contract law, that if there's clear and unmistakable evidence of novation, if there is a merger clause, if it's clear that on the face of a second agreement that it is a superseding agreement as to arbitration, that at that point the normal presumptions come into play. That is, the federal court addresses the question of arbitrability. And that's the hypothetical that was put to you. You now seem to be saying that regardless of whether there is clear and unmistakable evidence of novation, that it still goes to arbitration in the first instance for the arbitrator to decide the question of arbitrability. That is what I'm saying. I think we are just focused on step one and step two. No, no, we've got to focus on why you're changing your position because this really is, I mean, I'm acting surprised because I am surprised. This is not how I read your brief. Well, I think that what I'm expressing today is consistent with the FAA and the Supreme Court's decision to rent a center. The D.C. Circuit, for example, I guess in the national government case, did say in some instances that if the second agreement is so clear to abrogate the prior agreement, that in that case it would be for the court to resolve whether the abrogation and novation was effective. Indeed. And that's why I've asked you do you have any support for the position you're taking at the podium today because I don't remember you citing a case. In fact, I don't even remember you arguing this position. But do you have anything to support the assertion that no matter what you say later, you can never get out of arbitrating in front of an arbitrator in the first instance whether you've agreed to arbitrate? This issue is not a case of cipher, Your Honor. I don't think that any case has a sense of what's on these particular facts. But I think it's consistent, Your Honor, with the FAA and the purpose of what the FAA has intended. The FAA has intended to move people, to move parties who have so agreed to arbitrating as quickly and efficiently as possible. At time one, the parties here agreed that all issues, and this is at A354 of the observer here, all issues of the existence, validity, and scope of the arbitration agreement shall be decided by the arbitration panel. That's true. And that just seems to me to completely be evading the argument that you're getting from the other side. So let's assume for the sake of discussion here that the argument you were presenting was the argument that was in your brief, okay, and that you actually could get out of one of these things if you said something clear enough. Why don't you address their point that the 2014 argument is clear enough? As just a matter of contract interpretation, why are they wrong? Sure. So point step two, we assume that the issue of arbitrability is for this court. We think the district court's order still should be reversed because of the no supersession clause. You alluded to earlier the fact that there is no reference in the 2014 agreement to an arbitration agreement. But under the no supersession clause, that silence, the presumption is actually flipped because the parties didn't speak to arbitration. That means in the 2014 agreement, that means they just did not displace the 2008 arbitration agreement. It's not silence. We have on the dispute resolution provision, it talks about disputes that relate to the original agreement, the 2008 agreement, as well as the current agreement. And it relates to any broker pays shave product, not just the accused products, which is the language that appears elsewhere in the contract. So it does appear in at least two ways that it has expressly encompassed the subject matter for dispute resolution of even the 2008 agreement, doesn't it? But under the no supersession clause, in combination with New York law, the 2014 agreement would have to specifically address the rights and obligations of arbitration. And it provides in a dispute resolution provision a different set of procedures. Why isn't that new rights and obligations? It copies from the 2008 agreement the initial informal dispute resolution procedures that are in place in 2008. I absolutely agree with that, Your Honor. And it does not contain an arbitration provision. The absence of the arbitration provision, that's the specific thing that's at issue here. There's nothing in the language of also the original agreement that gives any sort of specific right to arbitration or a specific obligation to refrain from litigation. But I think Judge Krause's point is that the 2014 agreement speaks to any product, not just accused products, not just the existing ones, not just the ones that were reasoned about, but any product about which there's an alleged violation. It needs to be resolved pursuant to the 2014 three-step process, which is silent on arbitration. So I think if I understand Judge Krause correctly, once you've brought in any product, it eclipses the need for arbitration for any product. Respectfully, no, Your Honor, because if you look at page A274 of the recitals, it makes clear that the dispute that is at issue in the 2004 agreement pertains only to blade-retaining clips. 2014 was only about blade-retaining clips. In 2008, a much broader dispute involving multiple patents, other forms of intellectual property that had a lower resolution. I'm aware of the recitals, and I understand your point about the fact that the 2014 agreement does deal with a blade-retaining clip issue, but doesn't that just point up the fact that there is an issue of factors of what this agreement actually covers? Is it only the blade-retaining clip? Is it all products? Is it only the products but not the color issues and the performance of the 2008 agreement? Doesn't this all confirm the conclusions of the magistrate judge and the district court judge that there's really an issue of factor that needs to be decided in a forum before a court to make a fact finding? Even if there was some ambiguity in the agreement, in the 2014 agreement, and whether it affected innovation, notwithstanding the supersession clause, notwithstanding the heightened clear and definite intent standard in New York law, it still remains, at summary judgment, Gillette's burden to put forward evidence of mutual intent to know it, because Gillette's nomination is an authoritative defense to enforcement of the 2008 arbitration agreement. And there is absolutely no evidence in the record that Gillette put forth that the parties, that Dorco and Pace, agreed to abrogate the arbitration clause. What about the silence in the 2014 agreement, where it says, we need to discuss arbitration in the red-line version and then poof, gone, when it was signed? Isn't that enough to show, from their point of view, at least enough to get past what you've just recited as their burden to show clear and unmistakable intent to know it? But that's with respect to Gillette. There's certainly evidence on Gillette's side that they intended to But it's the conduct of the party who signed it on the defendant's point. You signed the agreement with that point no longer within it. Isn't that enough? And with respect, it had to do with the supersession clause. So, again, the silence flips the presumption. If there wasn't a supersession clause, certainly the omission of an arbitration agreement here would cut in favor of Gillette. What other purpose would there be to make reference to the original agreement and to all the products? It's not to provide for some cure, as the district court and magistrate pointed out. That was already provided for. We know from the record, it's 1642-43, Dworker's intent for putting in the original agreement language was to displace arbitration with respect to blade retaining clips only. They thought that all blade retaining clips should be resolved just with respect to the 2014 agreement. But then it would say accused products instead of any Dworker-Patia product. A change in the language from other parts of the 2014 agreement, which were limited to the accused products. Your Honor, the parties could have inserted blade retaining clips language in each provision, in the personal jurisdiction provision, in the ADR provision, elsewhere throughout the agreement. But the recital made clear in 8274 that this is only about a blade retaining clip dispute. It was Dworker, I mean it was Gillette, that was resisting any sort of global agreement at this stage, recommending that the 2008 agreement was a global resolution. And in 2014, there was a one-off blade retaining clip dispute. Just by arguing that, Mr. Adams, aren't you highlighting that there's a disagreement about what the negotiation was and what was actually agreed to? And that's the very issue that a fact finder would typically decide before saying definitively, yes, one side or the other side has got the better of it. But that would be the case, Your Honor, if there was any evidence reflecting Dworker or Patia's intent to abrogate the entirety of the 2008 agreement. There's absolutely nothing in the record, Gillette put nothing suggesting that Dworker or Patia's intent was to abrogate the entire agreement. Okay. Thank you, Mr. Adams. We'll be back on the phone. Thank you. Good morning, Your Honors. May it please the Court, William J. for Gillette. This case does indeed turn on the interpretation and effect of the 2014 agreement, not the 2008 agreement, and the 2014 agreement contains no arbitration clause in its interpretations for the Court. How does it not involve the 2008 agreement, though? I mean, don't you have to also ask the question about when you read these two things together, 2008 and 2014, this is the conclusion? The effect of the 2014 agreement certainly is worked upon the 2008 agreement. That's right. And so if that's the case, why is it that the defendants here are not correct when they said, look, we deliberately put this no supersession clause in the 2014 agreement. The 2014 agreement is by its terms limited to the particular thing at issue there, the blade retaining clip. And Gillette didn't say, hasn't put anything in the record to indicate that we intended to override that broad 2008 agreement, which in fact we said in the 2014 agreement wasn't superseded. With that information all before it, why wasn't the District Court obligated to give power to the 2008 agreement's arbitration demand? So there's a lot in Your Honor's question, and I'd like to try and take it piece by piece. You don't give power to the 2008 arbitration clause when the question before the court is whether that clause itself has been novated, just as you wouldn't give power to an arbitration clause when the question before the court is whether the parties agreed to that arbitration clause. Why shouldn't we be looking to National Railroad to give us guides on that very question? Because otherwise it can, you know, I'll confess I'm sure I'm the least intelligent person in this room, but it makes my head hurt, these arbitrations, like who gets to arbitrate what kind of cases, right? Because you can always say, always say, well, you've just got to take one step back. It's an infinite regress. Why is it wrong for them to say, when you argue courts have avoided this problem by recognizing that the basic issue of whether the parties agreed to arbitrate in the first place is one only a court can answer, their response is, no, this isn't the first instance. The first instance is 2008, and we did agree on that, and they should live with it. Why are they wrong in looking at that and saying 2008 still arrived? But when the question is whether the clause itself embodies the consent of the parties to be bound by arbitration, you can't bootstrap the clause itself to provide the relevant consent. I understand their argument to be just the opposite, that you're the one bootstrapping, that indeed there was an agreement signed in 2008, and that clearly did say we're going to arbitrate arbitrability by absorbing the ICC rules, and that you're not permitted to run away from that. You're actually in National Railroad land where now you're arguing about the duration of your agreement in 2008, and that is for arbitrators, not for the court. So I'd like to make two points about National Railroad. National Railroad describes itself as looking at the length and the breadth of an agreement, but there's only one agreement in that case. It was amended over time, but we don't have a situation where the parties are trying to novate the arbitration clause specifically. So you're still basically in the forecourt. That's not true. National Railroad specifically talks about novation. They reference it in regard to those two changes. They make a specific statement, if I'm not mistaken, Your Honor. But if I may point you to what's being novated in that case, it is not the arbitration clause. It's the termination provision was changed over time. So there was termination provision number one, amended later to termination provision number two, amended later to termination provision number three. It does explicitly discuss, in its more general framework, later agreements and novation. And under New York law, we also know in primex that the New York courts take the approach that a self-executing termination agreement is viewed as equivalent to the novation of a subsequent agreement. So what basis do you have for treating them differently? You're asking that we should in this context. Well, we're suggesting that they be treated differently for two reasons. One, where you're dealing with a separate agreement. And two, where it focuses directly on the arbitration clause itself. And I'd like to analogize to the validity context. Mr. Adams mentioned the Renner Center case a number of times. And what the Supreme Court said in Renner Center is that when you have a challenge to the entire agreement in which the arbitration clause sits, that may be something that could go to an arbitrator. But when you have a challenge to the validity of the arbitration clause itself, just like when you have a challenge to the formation of the arbitration clause itself, you can't rely on the arbitration clause to send that very dispute to the arbitrator. But that's what the 2008 agreement did when it incorporated the ICC rules. But that may be an answer if this dispute had arisen in 2009 and we didn't have the 2014 agreement. But the 2014 agreement has no supersession. It makes reference to the original agreement. So the 2014 agreement didn't annihilate all of the 2008 agreement. It didn't annihilate the entire agreement, Your Honor. But the point of our argument and the point that the district court has ordered a trial on is whether it eliminated the arbitration clause. We think that is a very important distinction. Now, the no supersession clause, as my friends call it, I'd like to take that up because there have been a couple of questions about that. First of all, just a preliminary point, it's just not correct to call it the no supersession clause because that comes out of the heading. And we know from the text of the agreement that the headings are not to be used to construe the statute. But the text of it says the agreement shall not supersede. The original agreement accepts. What title do you want to give it? Even though in the document that your folks signed it says no supersession and in the body under the caption it says no supersession, what descriptor do you want to give it? It doesn't say no supersession in the body, Your Honor. It says the specific rights and obligations granted and assumed herein. And that's what I want to focus the court on because the question before the court really is whether by changing the dispute resolution procedure from one that has five steps ending in arbitration to one that has three steps and no arbitration. Let's work with the following and accept that we have an initial agreement that is clear by its terms, there's no dispute, that that agreement gives to the arbitrator the question of arbitrability as to validity, scope, and existence of the arbitrability of disputes under that agreement. And there's a subsequent agreement that is not on its terms clear and unmistakable that it is superseding it but raises legitimate questions about whether it's superseding it. It's ambiguous on that point. What is a court to do under those circumstances and which way does the presumption go where there is a challenge to the continuing existence or continuing validity of the original agreement with all of those as accepted premises? Certainly if the premise is that the original agreement said everything is for the arbitrator but then the subsequent agreement, one reading of the subsequent agreement, you said it was ambiguous in your question, but one reading of it is that it novated or eliminated the arbitration obligation, then that is for the court because you cannot use the presumption in favor of arbitrability where you haven't yet established that the parties still have a valid binding agreement to arbitrate. Put it in where it's ambiguous. Right, because that is the question. Because ambiguity beats clarity. An agreement, if the parties have agreed not to arbitrate anymore, then that's the question. That's the point. The point is at one point you very clearly did agree to arbitrate and then at a later point you raise a question. So the thing we're wrestling with is can you defeat clarity by raising a question? The New York law, which is the operative law about novation, makes I think very clear that you don't have to say the magic word novation in the subsequent agreement. It's ultimately a search for intent. What's the standard under New York law for effecting a novation? There's a four-part standard, and I'm drawing this from the Healy v. Healy divorce case from the Appellate Division, Third Department, that there was a previously valid agreement, that the parties agreed to a new contract, they extinguished the old contract, or in this case the relevant provision of the old contract, and there's a valid new contract. Right, and I apologize. That is the test. But what's the standard for proving a novation? The standard for proving a novation requires you, and in this case we're all focused on the extinguishment part, you have to prove, but not just looking at the text of the contract, looking at all available information, you have to prove that the parties had an intent to novate, an intent to substitute the new provision for the old. I'll ask again. What's the standard? What's the kind of evidence you have to produce? Is it clear evidence? Some of the sources refer to clear and definite intent, which is not the same thing as clear evidence, but I think that, you know. What are they trying to get at? What do you think they're trying to get at there, Mr. Jay? Isn't the New York case law telling us that it takes more than ambiguity to novate? It takes more than throwing some dust into the gears. You've got to do something pretty clear and definite to demonstrate a novation. That may be so, Your Honor, but it's not correct to say that you have to do it in the text of the agreement itself. That's made clear by the Warburg case that my friends cite. It is made clear in particular, I think, by the Sheedy case that we've cited in our brief. In both of those cases, the New York courts turn past the text of the agreement and say this is ultimately a search for intent. We want to see what the party's meeting of the minds was. We won't refuse to give effect to their agreement just because of some ambiguity in the text. We will look at their course of dealing. We will look at how they behaved. We will look at the extrinsic evidence. Of course, the response from the other side is no, you are refusing to give effect to the intent of the parties because there's only one thing that is clear, and that's in 2008, we definitely said we were going to arbitrate. If you want to defeat that, it's not enough for you to come in and say we've got questions about this. We've got at least an ambiguity because if ambiguity beats clarity, then you substantially undermine the quality and effect of arbitration clauses because these things never come up unless one side wants out. By definition, these only come to dispute in front of us because one side wants out, and if we allowed somebody to get out every time they could say, well, I've got a question, then you've defeated the power of arbitration. What's your response to that? My first response is that if the text of the second agreement doesn't permit a reading that there's a novation, then that argument won't get any farther. If there is no extrinsic evidence that points to novation, I'm sorry, if there is an ambiguity but there is no extrinsic evidence that would solve that, then you don't get any farther. But if the standard is clear evidence and you're in a circumstance where it requires extrinsic evidence and a trial to determine the intent of the parties, then haven't you answered the question of whether the evidence is clear? Respectfully, no, Judge Krauss, because the New York, I understand that my friends have been arguing that it's got to be in the text, and if the text is ambiguous, that's the end of the inquiry. The novation has to be clearly stated in the text. That is just not the law in New York, and if it were the law, then neither Warburg nor Sheehy would have looked, nor for that matter, the Continental Stock case, which says that it is best to manifest in the language but does not have to be manifest in the language, would have approved the consultation of extrinsic evidence. Were either of Mr. Ruffledge's statements to the ICC presented to the district court? The evidence from the ICC was not submitted to the magistrate judge. It was submitted after the magistrate judge's ruling. So did all three statements, both Ruffledge's statements and the statement from the defendants, that went to the ICC, are you saying all three statements are in the district court docket and the district court had access to all three? The magistrate judge did not. The district judge did. All three? I believe that's right now. They're not discussed in the opinion, and the district court may have concluded that it wouldn't be proper to rely on them. But, yes, they were on the docket. They're in the record. Okay, because I understand that one of the arguments was that your adversary says they were available to the court because they were referenced in the ICC opinion. And I'm trying to verify the docket's sealed, and so I'm trying to verify were those statements actually presented, not just the ICC opinion. There's a motion to intervene and to present additional evidence that Your Honor will find on the docket. I've read the docket. The access is a challenge when you seal. My question specifically, though, were the three ICC statements actually presented to the district court? So, Your Honor, you're referring to the two records declarations and the one on declaration. Correct. They are in the appendix submitted to the district court. I'm aware they were presented to us. My question is did the district court judge have access to them? I'm aware the magistrate judge only did not have access to at least one of them from what the ICC said. I'm asking were the three presented. I know what's in our appendix. I've seen them. Yes, they're in your appendix because they were submitted. They're submitted to the district court as attachments to a motion to intervene and supplement the record. Very good. Thank you. All right. One last question, if I might, and this was part of my compound question to you earlier that you were going to get to, I think. Why isn't it the case that since this was the 2014 agreement limited to blade retaining clips, that that in and of itself shows there was no intent, let alone a lack of clear evidence to novate, there was no intent to novate the arbitration clause? Well, respectfully, Judge Jordan, the reference to blade retaining clips is in the preamble. My friend characterized it as saying that that is the only thing that this agreement is about. The word only doesn't appear in the preamble. We think that the best evidence of what the parties did, I want to get back to the text of the dispute resolution clause, and this was brought out by Judge Krause's question to my friend before. It says any Dorco Pace shave product. It doesn't say accused products, which is the term of art used in this agreement to refer to the products that were accused of infringing the blade retaining clips patent. It says any Dorco Pace product that is accused of violating either this agreement or the original agreement. That's a very large funnel. It funnels in a lot of disputes and potential disputes. And what procedure does it send them through? It sends them through the three-step procedure that looks an awful lot like the first three steps, but not the arbitral steps of the dispute resolution provision in the first agreement. Okay. That's the emphasis we want you to draw. All right. Thank you, Mr. Jay. Thank you, Your Honor. Mr. Adams. I'd like you to start right there, if you would. Absolutely, Your Honor. So starting there and as to Judge Krause's question about the any Dorco Pace product, why is that in the ADR provision for the 2014 agreement? That's in the ADR provision for the 2014 agreement to protect future products. Accused products are just subject to a defined term that are in the agreement, and if you just used that same term in the ADR provision, then there wouldn't be an ADR with respect to future products that were not in existence at the time of the agreement. So that's why the accused products term would not have been sufficient. Why is it then used in conjunction with the original agreement? How would future products otherwise be subject to an original agreement? The intent of the parties was to cover both future products and existing products, and so those existing products could be subject to the 2008 agreement. So it's a catch-all phrase that would, therefore, bring in both disputes with respect to the 2008 agreement and the 2014 agreement, to the extent they involved money in retaining clips, and that was Dorco's intent. There's absolutely no evidence in the record, and I didn't hear my colleague on the other side, that Dorco or Hayes intended by that language to aggregate the 2008 agreement arbitration provision in its entirety, or particularly with respect to products that do not involve blade retaining clips. So any means existing blade retaining clips and all future products, but any does not mean other existing products. Any means existing products and future products, to the extent that a dispute arises under the agreement with respect to blade retaining clips. So it only deals with future and present and prior blade retaining clips. That's correct. This is a blade retaining clip agreement. Absolutely, Your Honor. That's correct. If I could, can you give us a practical, and I should ask Mr. J this, but where does the arbitration stand right now? What is the state of play today? Sure. The arbitration hearing has concluded. The parties are now in the post-hearing briefing. That should be concluded by the end of this month, and then it will be submitted for decision by the arbitrators. So the arbitration is ongoing and has not concluded, although the hearing has concluded. I'd also like to turn back to the no supersession clause, and this is step two in the New York law. It is correct that the New York law requires clear and definite mutual intent, and here that's absent both because the agreement is, in the worst case for us, ambiguous as to novation, and because there's no evidence in the record whatsoever that Dorco or Pace sought to novate. So putting those two things together, Dorco, I mean Gillette, failed to satisfy its burden of summary judgment. So even if you disagree with us on step one, think it's an issue for the court, even if you disagree with us and think that the issue with the contract is ambiguous, at the very least the district court erred in refusing to state the arbitration because there was absolutely no evidence in the record from Gillette to show mutual, clear, specific, definite intent to novate. For these reasons, we'd ask you to reverse. Okay. Thank you, Mr. Adams. Thank counsel for arguing today. Appreciate it.